## CLARENCE J. HENDRICKSON v. N. H. GRENGS.[1]

June 20, 1952.

No. 35,776.

*Arthur O. Frieberg,* for appellant.
*R. M. Saltness,* for respondent.

LORING, CHIEF JUSTICE.

This is an appeal from a judgment for plaintiff in a suit brought in Lac qui Parle county district court to enjoin foreclosure of a chattel mortgage and to recover damages for violation of a temporary injunction and for an alleged unreasonable attempt to foreclose such mortgage.

Briefly, plaintiff leased a filling station from defendant, giving to defendant a chattel mortgage for personal property used in the business. After a few months, defendant attempted to foreclose the mortgage and evicted plaintiff from the premises. Plaintiff obtained a temporary injunction to prohibit such actions, but defendant continued in certain of them.

[1]Reported in 54 N. W. (2d) 105.

In his assignments of error, defendant attacked the findings of the trial court. However, the settled case was not included in the printed record, and on oral argument defendant waived any attack on the findings. Two primary questions are before this court for consideration:

(1) Were the ouster and attempted foreclosure reasonable?

(2) Do the findings sustain the award of $2,000 damages to plaintiff?

The facts are as follows: Prior to July 10, 1947, defendant was owner of a filling station property on highway No. 75 in the city of Madison. Part of the property was used by defendant as a retail station, and part was used as a bulk oil station and as a garage for defendant's oil transport trucks.

July 10, 1947, defendant and plaintiff entered into an oral agreement whereby plaintiff leased the part of the premises used as a retail filling station, agreeing to pay as rent one cent per gallon of gasoline and five cents per gallon of oil purchased from defendant. It was agreed that plaintiff would buy all gasoline, oils, and greases from defendant at regular wholesale prices, plus the charge for rent, and pay for them on delivery. Defendant was to fix the retail price, allowing plaintiff a net commission of four cents per gallon of gasoline sold.

Defendant sold to plaintiff all the usual stock and equipment of a filling station, including a 1936 automobile. Certain tires were excepted, and the agreed price was $1,675. Plaintiff was to pay this in $100 monthly installments, commencing August 10, 1947. He was to pay for the tires on demand, as he sold them at retail. Defendant agreed to patronize plaintiff's business on open account to the extent of at least $100 per month, which was to be used as an offset on installments of the purchase price. Defendant also agreed to assign to plaintiff his dealer's franchise to sell Montgomery Ward tires at retail. While the parties agreed to reduce the agreement to writing, they did not do so at that time; in fact. no written lease ever was executed.

Montgomery Ward later advised the parties that it would not recognize the attempted assignments of the franchise, so plaintiff and defendant agreed that plaintiff could buy tires from the company on defendant's credit and pay for them when the bills became due. In November 1947, plaintiff did so purchase tires in the sum of $98.32 (which presumably did not fall due until sometime in December). Plaintiff has not paid this amount, and defendant has been required to pay it.

While the parties agreed that plaintiff was to pay defendant for supplies when delivered, this agreement was not carried out. Instead, most of the time it was paid a day or two later. The trial court found that defendant waived the requirement of payment on delivery.

November 13, 1947, in payment for supplies, plaintiff gave defendant a check for $118.94. When the check was presented to the bank for payment, plaintiff's account was short $25.46. Defendant thereupon deposited that amount to plaintiff's credit, and the bank paid the check.

The same day, plaintiff executed and delivered to defendant a promissory note bearing five percent interest, and a chattel mortgage in the amount of $1,675, dated July 10, 1947. These instruments covered the purchase of the stock and equipment, excluding the tires. The note provided that on default the holder could accelerate the remaining payments. The mortgage contained the usual insecurity clause.

At that time, defendant owed plaintiff $610 for services and materials furnished. Payments on the mortgage were due for August 10, September 10, October 10, and November 10, 1947. In spite of the fact that $400 was then due on the mortgage, the parties agreed that the $610 should be applied, $300 on the mortgage and $287 on plaintiff's original indebtedness for the tires. The trial court found that the tires have been completely paid for. By the arrangement, one past-due mortgage payment was left unpaid. Defendant told

plaintiff that the account could continue as before. The remaining $23 owed to plaintiff was not applied to any debt. Added to this should be $9.05 for services and materials furnished defendant between November 13 and 17. Defendant has not paid this amount ($32.05) to plaintiff. The trial court found that by this arrangement defendant waived his right to foreclose the mortgage for default in the November 10 installment without first making demand on plaintiff for its payment.

On Saturday, November 15, 1947, plaintiff paid by check for gasoline delivered November 13. When the check was presented to the bank for payment, it was refused on the ground of insufficient funds. The same day defendant presented the check to plaintiff, who paid it in cash. Defendant then told plaintiff that he would not take any more checks from him.

The same day plaintiff ordered another supply of gasoline to be delivered on or before the following day, Sunday, November 16. The court found that defendant "wilfully and without lawful excuse refused to deliver said gasoline and that as a consequence thereof plaintiff was compelled to close said retail filling station on Sunday afternoon, November 16, 1947, for lack of gasoline to sell to customers."

Monday, November 17, 1947, without demanding payment of the November 10 mortgage installment, defendant caused a notice of foreclosure to be served on plaintiff. The same day defendant entered the premises, took possession of all the merchandise, including the tires, removed the new tires from the premises, and kept the merchandise in his possession. Defendant changed the locks on the leased premises and ousted plaintiff from them, not allowing him admittance to take inventory or to recover business records and personal effects until January 13, 1948. November 17, 1947, defendant opened the filling station in his own name. November 19 defendant took possession of the automobile.

200

At this time, the unpaid balance of the
note was ...............................$1,375.00
Amount due on check of November 13, 1947..   25.46
Tires purchased on defendant's account.....   98.32

$1,498.78[2]

The trial court found that the value of the
merchandise and equipment at the time was $1,070.61
Tires on hand .........................   190.77
Amount owed plaintiff by defendant.......   32.05

$1,293.43

As can be seen, the value of stock on hand plus defendant's debt is some $200 less than the amount outstanding against plaintiff. However, plaintiff attempted to obtain gasoline, and, if he had been able to obtain this, the inventory would have been increased considerably. While the trial court did not specifically find how much business cash was on hand on that date, it must be assumed, in view of the finding as to the failure to deliver the gasoline, that there was cash to pay for the gasoline, and this would almost balance the two accounts. This is borne out by the court's finding that defendant was no more insecure on November 17, 1947, than he was on July 10, 1947, and that the attempted foreclosure was "capricious, unreasonable, oppressive." The court also found that defendant's acts amounted to an eviction of plaintiff from the premises and a conversion of his property and a total breach of their agreement.

On November 26 and December 29, 1947, the trial court issued orders enjoining defendant from foreclosing the mortgage and other acts. The court found that defendant wilfully and intentionally violated those orders as follows: (a) Permitted plaintiff's stock of soft drinks to freeze and thus become unfit for sale or use; (b)

---

[2]There is no finding as to the amount of accrued interest at that time, but at five percent it was approximately $30.

permitted other of the merchandise to lie about the premises; (c) caused a partition in the building to be removed; (d) refused to permit plaintiff to reopen and occupy the premises until January 12, 1948; (e) obstructed and interfered with plaintiff's business (after January 12, 1948) by offering to sell and repair tires and to sell lubricating oil at retail; and (f) took possession of and failed to deliver to plaintiff the latter's business records and accounts.

May 8, 1948, in order to mitigate damages, on stipulation of the parties, the injunction was relaxed to permit defendant to reopen the retail filling station.

The court found that from July 10 to November 17, 1947, plaintiff sold approximately 30,000 gallons of gasoline at a gross profit of four cents a gallon ($1,200), and that plaintiff sold other items, of which "there is no competent evidence from which the Court can determine the amount of income * * *."

The court found "the plaintiff has been damaged in the sum of $2,000.00, in addition to the specific items of damage hereinbefore found and determined." The court in its judgment discharged the injunction, declared defendant to be the owner of the property, cancelled the note and satisfied the mortgage, and awarded plaintiff $1,779.45, plus costs and disbursements. The computation for the award was as follows:

FOR PLAINTIFF:

| | | |
|---|---:|---:|
| Value of stock and equipment covered by mortgage and on hand November 17, 1947 | $1,070.61 | |
| Tires on hand November 17, 1947 | 190.77 | |
| Interest on above amounts (six percent) | 132.55 | |
| Balance owed to plaintiff | 32.05 | |
| Damages | 2,000.00 | $3,425.98 |

FOR DEFENDANT:

| | |
|---|---:|
| Unpaid balance of mortgage | $1,375.00 |
| Interest to date | 147.75 |

| | | |
|---|---|---|
| Due defendant for tires................ | 98.32 | |
| Check transaction ................... | 25.46 | 1,646.53 |

Award to Plaintiff.................................$1,779.45

As can be seen above, aside from the $2,000, there is no allowance for future profits; the only inference is that the $2,000 was intended to cover the loss of such profits and any punitive damages awarded.

■ Were the ouster of plaintiff and attempted foreclosure reasonable? As stated above, the trial court found that they were not. M. S. A. 511.10 provides:

"No mortgagee, nor any one claiming under him, shall arbitrarily, or without just and sufficient cause, declare any condition or stipulation of a mortgage broken prior to a default in the performance thereof; * * *."

In Casper v. Regional Agric. Credit Corp. 202 Minn. 433, 278 N. W. 896, we held that there must be reasonable grounds for believing that the security is in danger, and that this is a question for the trier of fact.

In the case at bar, the findings of the court sustain its conclusion that there was an eviction and that the attempted foreclosure was unreasonable. At the time of the eviction, the amount due defendant was slightly in excess of the value of the goods plus the amount due plaintiff; but, as stated above, plaintiff's inventory would have been increased considerably if the gasoline had been delivered to him. It should be noted that the mortgage was for the full purchase price, so it is not a case in which a difference resulting from some down payment has been dissipated. Furthermore, the parties must have anticipated that plaintiff would sell the goods, thereby decreasing the value. True, to stay in business, plaintiff must replenish those supplies; but this is precisely what he tried to do by getting delivery of gasoline.

Nor is this altered by the check transactions. As to the first, there is no finding that defendant ever told plaintiff that his funds were

short some $25; and his bank statements would not have disclosed it, as that amount was deposited to his credit. As the findings state, the second check was paid in full by plaintiff the same day it was issued.

Defendant points out that a mortgage payment was in default on November 17, 1947. This resulted only from the fact that moneys owed to plaintiff were not entirely applied to the mortgage debt. When we consider that this transaction and the execution of the mortgage took place at a time when the November payment was already due, we can only conclude that the trial court was correct in finding that defendant waived his right to foreclose without demanding payment. M. S. A. 335.27 and In re Estate of Hore, 220 Minn. 374, 19 N. W. (2d) 783, 161 A. L. R. 1366, do not deal with this problem; they deal only with liability without presentment. Liability is not disputed in the case at bar.

Defendant also contends that the foreclosure was made necessary by the act of plaintiff in closing the filling station. This contention might have some force if plaintiff's closing were not caused by the wrongful act of defendant in refusing the gasoline. By the terms of the agreement, plaintiff could not obtain gasoline elsewhere. When defendant refused the delivery, plaintiff had no recourse but to close the station. Instead of then offering delivery, defendant evicted plaintiff and caused foreclosure proceedings to be commenced. In its conclusion that the acts of defendant were unreasonable the trial court is affirmed.

■ The next question is whether the award of $2,000 in damages is sustained by the findings. As stated above, the award must have included loss of future profits as well as some punitive amount. Some indication of how much future profits would have been is the finding that from July 10 to November 17, 1947, plaintiff sold approximately 30,000 gallons of gasoline at a gross profit of four cents a gallon, or a total of $1,200; and that there were other sales the amount of which the court could not determine. It is material

that one of the reasons, if not *the* reason, why such amounts could not be determined is that defendant prevented plaintiff from obtaining his business records.

Defendant cites Miller v. Reiter, 155 Minn. 110, 192 N. W. 740. That case held that an award cannot be based on conjecture. However, in that case the business was interrupted for only about three and one-half months, and the amount awarded was the same as in the instant case. Furthermore, in the present period of inflation, $2,000 amounts to much less than it did at the time the Miller case was decided. While we granted a new trial in that case, we said (155 Minn. 112, 192 N. W. 741):

"* * * It is the settled doctrine of this court that losses of profits suffered through the interruption of an established business may be recovered. [Citing cases.] Loss being shown, an award of damages will not be denied merely because of the difficulty of ascertaining them, * * *."

That statement is persuasive in the case at bar when it is considered that the difficulty of proof was occasioned by the acts of defendant himself.

In Emerson v. Pacific Coast & Norway Packing Co. 96 Minn. 1, 8, 104 N. W. 573, 576, 1 L.R.A.(N.S.) 445, 113 A. S. R. 603, 6 Ann. Cas. 973, this court said:

"* * * The principal contention of the defendant is that the damages are conjectural and speculative. The uncertainty does not reside in the nature of the business. Deep-sea fishing is not more speculative than mining, for breach of contract with respect to which future profits have been allowed as damages. [Citing cases.] Nor is there any uncertainty as to the existence, but only as to the extent, of the profits. [Citing cases.] It is no exoneration to defendant that his misconduct, which has made inquiry as to the quantum of harm necessary, renders that inquiry difficult. [Citing cases.] The best the law can do is to award approximate compensation.

Its failure to do even and exact justice in such cases is not more conspicuous than in many others. No other remedy is available."[3]

Furthermore, there were strong grounds for allowing punitive or exemplary damages in the case at bar. The defendant not only wrongfully took mortgaged property but also violated the injunction of the court. See, Kemmitt v. Adamson, 44 Minn. 121, 46 N. W. 327. The award of damages is sustained by the findings.

The judgment of the trial court is in all things affirmed.

---

[3]Also, see, *e. g.*, Olson v. Naymark, 177 Minn. 383, 225 N. W. 275; Peabody v. Citizens State Bank, 98 Minn. 302, 108 N. W. 272; Watre v. G. N. Ry. Co. 127 Minn. 118, 149 N. W. 18; and Willmar Gas Co. Inc. v. Duininck, 236 Minn. 499, 506, 53 N. W. (2d) 225, 229, where we said: "Notwithstanding this uncertainty, a wrongdoer who is found to have caused harm should not be allowed to complain of the uncertainty of proof of damage if his own wrongdoing has caused the uncertainty."