**HILLTOP VILLAGE, INCORPORATED,**
Petitioner,

v.

**KERRVILLE INDEPENDENT SCHOOL
DISTRICT, Respondent.**

No. B–142.

Supreme Court of Texas.

March 27, 1968.

Rehearing Denied May 15, 1968.

Biery, Biery, Woods & Davis, Leonard E. Davis, San Antonio, for petitioner.

Lavern D. Harris, Kerrville, for respondent.

STEAKLEY, Justice.

The question for decision in this declaratory judgment suit brought by Petitioner, Hilltop Village, Incorporated, against the Respondent school district, is whether the properties of Hilltop Village, a nonprofit corporation engaged in providing a home for older adults, qualifies for exemption from ad valorem taxation as an institution of purely public charity. The denial of the exemption by the trial court was affirmed by the Court of Civil Appeals. 410 S.W. 2d 824. We affirm.

The case was submitted on an Agreed Statement of Facts. Hilltop Village was incorporated in Texas as a nonprofit corporation under the authority and auspices of the Southwest Texas Conference of the Methodist Church. Its directors are elected by the Conference, and all officers and directors serve without pay. Article II of the restated and current articles of incorporation states the purposes of the corporation:

"This corporation is formed under the Texas Nonprofit Corporation Act for charitable and benevolent purposes, and in carrying out such purposes it shall have the authority under the laws of the State:

"To establish, maintain, operate and manage a home for older adults in the Kerrville District of the Southwest Texas Conference of the Methodist Church; to acquire improved and/or unimproved real property for such a home and to contract for such acquisition; To construct and/or remodel improvements on such property for use as such a Home, and to contract for such construction and/or remodeling;

"To accept and receive gifts, grants and bequests for the use and benefit of such a Home;

"To hold, invest and re-invest and expend such funds and property so received for such purposes;

"To do all other acts reasonably necessary, proper and advisable in carrying out the specific powers and authorities above enumerated;

"To conduct other appropriate charitable work or enterprise in connection with such a Home."

Article VIII of the charter further provides:

"*Section 1.* This corporation is a nonprofit corporation and is without capital stock. The value of property now owned by the corporation is estimated to be $250,000, and all funds and other property it shall hereafter acquire, of whatever kind and from whatever source, shall be used exclusively for the purpose for which said corporation is formed. Upon dissolution the assets of this corporation shall be distributed to one or more similar purposes which are exempt from State and Federal taxation on the basis of being a charitable institution, said distribution to be determined by action of the Board of Hospitals and Homes of the Southwest Texas Conference of the Methodist Church.

"*Section 2.* For carrying out the purposes for which it is formed, this corporation shall receive such funds as may be necessary from voluntary contributions, subscriptions, donations, conveyances, wills, annuities and otherwise.

*"Section 3.* The title to all property owned or used in connection with the institution to be established by this corporation shall vest in said corporation."

The bylaws of Hilltop Village are consistent with the charter provisions, and its requirements for admission are stated in Article IX:

"Section 1. The Home shall be open to both sexes at age 62, in exceptional cases and on special terms, and when the Committee on Admissions so approves by three-fourths (¾) vote of members present, men and women under 62 may be admitted.

"Section 2. Admission shall be made only after proper application is filed with the Administrative Director, giving satisfactory references as to character, habits and disposition; and bearing the physician's certification of the resident physician of this Home at the time of entrance that applicant is free from all contagious and infectious diseases and mental infirmities.

"Section 3. There is no admission fee, or fixed amount, for admission to the Home but those who are financially able to pay for the cost of their care shall be expected to do so on a basis determined by the Board of Directors. In any case, admission will be a matter of negotiation and mutual agreement and each case will be considered on its own merit.

"Section 4. It is understood that in situations where the member of the Home has less than is needed to pay the cost of such member's care, the administration of the Home shall have the authority to apply for old age assistance or any other source of financial help for older people.

"Section 5. In situations where the member of the Home has no funds for personal use, the Home may provide such member with funds, the amount of such funds to be determined by the Committee on Admissions.

"Section 6. Hilltop Village shall have the authority to discharge any resident when it is deemed by three-fourth (¾) of the members of the Admissions Committee who are present at such meeting that continued residency of such resident is not in the best interest of maintaining the Home and the proper atmosphere for the benefit of its other residents."

It was further stipulated that Hilltop Village is a single one-story building development complex composed of room accommodations for 133 persons, together with a cafeteria, chapel, library, game lounge, or social area, a laundry room, a canteen, mechanical rooms and administrative offices. Funds to construct the improvements were obtained from a mortgage company loan backed by a one hundred percent guarantee from the Federal Housing Administration. The precise stipulation as to the admission policy of Hilltop Village is this: "[I]t is the policy of the home that no one is denied admission because of financial inability to pay. This policy is established in Section 3 of Article IX of the current bylaws * * * and this provision has been in the bylaws since the corporation was chartered." It is noted, however, that Section 3 of Article IX of the bylaws referred to in the foregoing stipulation states that "In any case, admission will be a matter of negotiation and mutual agreement and each case will be considered on its own merit." It may also be noted that Section 5 of Article IX of the bylaws is permissive in its authorization for the home to provide funds for needy residents. It was further shown that at the time of trial there were eighty-six residents of the home of whom sixty-seven were financially able to pay the full cost of their care and nineteen of whom paid less than full residential costs. It

was not shown whether these nineteen residents were provided the necessary funds by the home as authorized by Section 5 of Article IX of the bylaws or whether such assistance was obtained from old age assistance or other sources of financial help for older people as contemplated by Section 4 of Article IX. In any event, it was stipulated that twenty-two percent of the residents of the home receive some charity in varying amounts.

It was also stipulated that Hilltop Village operates a canteen without profit selling malts, ice cream, candy, stationery, toilet articles and sundry other items; that it has entered into an agreement with a local vending machine operator under which candy and cigarette vending machines are placed on the premises, the profits from which are divided; that it operates a beauty shop for its residents and utilizes the revenues therefrom in sustaining the operation and for general purposes; and that on occasions it furnishes free meals to civic clubs and free meals and guest rooms to visitors with donation boxes available from which contributions are regularly received. Further, that Hilltop Village has no source of income other than the rental from the housing units, the nominal income from the services and vending machine agreement above-mentioned, and that received from voluntary contributions and donations. It has operated at a substantial loss since its organization.

Article VIII, Section 1, of the Texas Constitution, Vernon's Ann.St. requires that all property in this State, other than municipal, shall be taxed in proportion to its value, subject, however, to the provision in Section 2 of Article VIII: "* * * But the legislature may, by general laws, exempt from taxation * * * all buildings used exclusively and owned by * * * institutions of purely public charity." The pertinent implementing leg-

islative enactment is paragraph 7 of Article 7150,[1] which reads:

"Art. 7150. Exemption from taxation

"The following property shall be exempt from taxation, to-wit:

\* \* \* \* \* \*

"7. Public charities.—All buildings belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions not leased or otherwise used with a view to profit, unless such rents and profits and all moneys and credits are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. An institution of purely public charity under this article is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members when in want, sickness and distress, and provide homes for its helpless and dependent members and to educate and maintain the orphans of its deceased members or other persons."

■ To qualify under these constitutional and statutory requirements, an institution must be one of purely public charity in the purposes for which it is formed and in the manner and means it has adopted for the accomplishment of such purposes; this being so, and in addition, the properties which are the subject of the claimed exemption must be owned and used exclusively by the institution in furthering its charitable activities. Brief-

1. The reference is as the Statute appears in Tex.Rev.Stat.Ann. art. 7150, § 7 (1960).

ly stated, there must be a dedication of the properties to charitable uses accompanied by actual uses for such purposes.

Hilltop Village relies upon Santa Rosa Infirmary v. City of San Antonio, 259 S.W. 926 (Tex.Comm.App.1924, jdgmt adopted). This decision moves from the basic premise that Santa Rosa Infirmary met the requirements of a purely public charity in the purposes for which it was organized, in the dedication of its properties, and in its activities; the crucial question was whether the exemption was lost in the fact that its facilities were also available to pay patients who were charged for the services rendered them by the Infirmary. This is seen in the conclusions drawn by the Court:

"* * * And so believing that both reason and the great weight of authority sustain such a view, we hold here that the mere fact that pay patients predominate over those unable to pay, and that charges are made for drugs furnished those of the patients able to pay for them, and that charges are made against those able to pay for the use of the operating rooms, does not destroy or impair the exclusiveness of the use of the property by the Sisters of Charity, nor does it change the character of the institution from one of purely public charity."

■ The problem here, however, is whether Hilltop Village is an institution of purely public charity in its assumed task of providing a home for the aged in the manner it has chosen so to do. If it is, *Santa Rosa* settles the proposition that the exclusive ownership and use requirements of the Constitution are present even though there may be more pay residents than those unable to pay in full. Nor will the incidental uses of the properties for the operation of guest facilities, a canteen, a beauty shop and vending machines defeat the exemption. Cf. also City of Palestine v. Missouri-Pacific Lines H. Ass'n, 99 S.W.2d 311 (Tex.Civ.App.–

Amarillo 1936, writ ref'd) and Morris v. Lone Star Chapter No. 6, R.A.M., 68 Tex. 698, 5 S.W. 519 (Tex.Sup.1887).

■ The specific problem of the charitable exemption of a home for the aged is of first impression in our State. Institutions engaged in this activity have been recognized as qualifying for tax exemption in the jurisdictions of California, Minnesota and Kansas. Fifield Manor v. County of Los Angeles, 188 Cal.App.2d 1, 10 Cal.Rptr. 242 (1961); Fredericka Home for the Aged v. San Diego County, 35 Cal.2d 789, 221 P. 2d 68 (1950); and Estate of Henderson, 17 Cal.2d 853, 112 P.2d 605 (1941). Exemption has been disallowed in the jurisdictions of Ohio, Nebraska, Oregon and Florida. Philada Home Fund v. Board of Tax Appeals, 5 Ohio St.2d 135, 214 N.E.2d 431 (1966); County of Douglas v. O E A Senior Citizens, Inc., 172 Neb. 696, 111 N.W. 2d 719 (1961); Oregon Methodist Homes, Inc., v. Horn, 226 Or. 298, 360 P.2d 293 (1961); and Haines v. St. Petersburg Methodist Homes, Inc., Fla.App., 173 So.2d 176 (1965). It is apparent from a careful review of these decisions that they are not of controlling persuasion in determining the problem of exemption with us. The cases in the other jurisdictions present substantial variations in the organization and manner of operation of the institutions under review. The governing provisions of the Constitution and statutes of these states vary in their requirements for tax exemption, particularly as construed by their courts and in the tests established for exemption. The decisions recognizing tax exemption are rested principally upon the conclusion that people in later years have special care and residential requirements, the alleviation of which is of social value; and that exemption should be allowed where such needs are being met by institutions not organized or operated for private profit. The decisions denying exemption have emphasized that the occupants of the homes were the principal beneficiaries rather than society in general, and that society was not relieved of responsibility for persons in

need. All of the courts appear to pay homage to the rule that tax exemptions are subject to strict construction since they are the antithesis of equality and uniformity.

This Court said in City of Houston v. Scottish Rite Benev. Ass'n, 111 Tex. 191, 230 S.W. 978 (1921):

"In our opinion, the Legislature might reasonably conclude that an institution was one of "purely public charity" where: First, it made no gain or profit; second, it accomplished ends wholly benevolent; and, third, it benefited persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state."

These essential conditions were restated in *Santa Rosa Infirmary*, supra:

"But yet, if it may be said, within the purview of the Constitution to be a purely public charity, is it such an institution within the legislative definition thereof? A consideration of the legislative provision develops that at least two concurrent situations must exist: (1) The dispensation of its charities both to its members and others in sickness, distress, and death must be without regard to poverty or riches of the recipient; and (2) its property and assets must be placed and bound by its laws to relieve, aid, and administer in any way to the relief of its members when in want, sickness, and distress, and provide homes for its helpless and dependent members."

"The first requisite above mentioned plainly exists from all the testimony, and that its assets are appropriately bound by both corporate charters to the exclusive purposes of their general charitable declarations and intentions, seems equally true. * * *"

"The theory upon which institutions of this character are exempted from taxation is that they serve the government by relieving it to some extent of what would otherwise be a public duty or governmental function to care for the indigent, sick and afflicted, and it is the assumption by such institutions of this burden which compensates the government for the exemption granted them from the general obligation resting upon all citizens to pay taxes. * * *"

River Oaks Garden Club v. City of Houston, 370 S.W.2d 851 (Tex.Sup.1963), is our most recent writing upon the subject of charitable exemption from taxation. In denying exemption there, we reiterated the previously stated tests:

"* * * [A]n organization is not an institution of purely public charity within the meaning of the constitutional exemption unless it assumes, to a material extent, that which otherwise might become the obligation or duty of the community or the state"; and "* * * unless its funds, property and assets are pledged and used to provide for the basic needs of the sick, distressed and needy, whether the benefits be extended only to a small segment of society or to the public generally."

Hilltop Village is an institution providing special residental care for older citizens, but its facilities are available primarily to those who are able to pay. We have previously noted that its admission policy is stated in its bylaws to be a matter of negotiation and mutual agreement, with each case being considered on its own merit. In contrast are the operating facts emphasized by the Court in *Santa Rosa Infirmary*:

"With respect to the admission of charity patients no obstacle appears to have been placed in the way of their reception other than a requirement that statements of the applicants, or of other trustworthy persons, be furnished at the time of their admission, to fairly indicate that they were objects of charity and unable to pay for the services rendered them, and, while no claim was made that sick or afflicted were sought out to be made the recipients of charity, it

does appear that the infirmary was available and open to those who applied for free treatment."

■ We agree, contrary to the holding of the intermediate court, that the activity of providing facilities to meet the special residential requirements of the aged may qualify an institution for tax exemption as one of purely public charity under circumstances where, in the words of Article 7150, aid is dispensed to those in sickness or distress "without regard to poverty or riches of the recipient" and "the funds, property and assets of such institution are placed and bound by its laws to relieve, aid and administer" to the relief of those in want, sickness and distress. But it is apparent that Hilltop Village is not accepting residents without regard to their financial circumstances nor is it bound to assume charitable obligations or to engage in dispensing relief to those in need. The requisite elements of dedication and use in fact of its properties are not present. There is no assurance that society is being or will be relieved of the care and expense of those in need. This is not to say that all residents must be indigent or that the acceptance of payment from some will defeat tax exemption. It is to say that the institution must be one whose properties and assets are pledged in perpetuity to the relief of persons in financial need and to their assistance in obtaining the care they must have to prevent their becoming a burden on society. Laudable as it is in origin and operation, Hilltop Village does not meet the requirements of the Constitution and statutes of Texas for exemption from taxation as an institution of purely public charity.

The judgments below are affirmed.

Dissenting Opinion by POPE, J., in which NORVELL, J., joins.

POPE, Justice (dissenting).

I agree with the holding of the majority that homes for the indigent aged, when in fact they are operated as a public charity, are tax exempt, because they relieve the government of burdens it would otherwise be charged with solving. Sec. 11, art. 2351, Vern.Tex.Civ.Stat.; art. 1528a, Vern.Tex. Civ.Stat.; art. 1269k, Vern.Tex.Civ.Stat.; art. 695c, Vern.Tex.Civ.Stat. See, Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053 (1940); Pacific Home v. Los Angeles County, 41 Cal.2d 844, 264 P.2d 539 (1953); Fifield Manor v. County of Los Angeles, 188 Cal.App.2d 1, 10 Cal.Rptr. 242 (1961); Estate of Henderson, 17 Cal. 2d 853, 112 P.2d 605 (1941); Topeka Presbyterian Manor, Inc. v. Board of County Commissioners of Shawnee County, 195 Kan. 90, 402 P.2d 802 (1965); Assembly Homes, Inc. v. Yellow Medicine County, 237 Minn. 197, 140 N.W.2d 336 (Minn. 1966); In re Tax Appeals of the United Presbyterian Homes of Presbytery of Huntingdon, etc., 236 A.2d 776 (Pa.1968).

I cannot agree, however, with the conclusion of the majority that Hilltop is not, in fact, operated as a public charity. Hilltop's charter is for a charitable home; its receipt of gifts, grants and bequests is for that purpose; it must hold, invest and spend its funds for that purpose; the corporate property and that hereafter acquired must be "exclusively for the purpose for which said corporation is formed"; and when the corporation is finally dissolved, all of the corporate assets must be distributed to the use of similar purposes. The charter, it would seem, dedicates all of the property and funds of the home to charitable purposes from inception until final distribution upon the dissolution of the corporation.

The by-laws, in the opinion of the majority, are so lacking in such a dedication to charitable purposes as to defeat Hilltop's exemption. If its basic documents do not already so require, as I believe they do, this may be corrected by amendments to the charter and by-laws to provide that the institution's properties and assets are "pledged in perpetuity to the relief of per-

sons in financial need and to their assistance in obtaining the care they must have to prevent their becoming a burden on society."

I cannot agree that Hilltop is not, in fact, operating as a purely public charity. The parties specifically stipulated to the contrary in these words:

"Further it is the policy of the Home that no one is denied admission because of financial inability to pay."

In my opinion the agreed facts upon which this case was tried fully qualify the home for exemption, and those facts need to be more fully stated:

"Further it is the policy of the Home that no one is denied admission because of financial inability to pay. This policy is established in Sec. 3 of Article IX of the current By-Laws (Exhibit 'J') and this provision has been in the By-Laws since the corporation was chartered. At the present time there are 86 residents, of whom 67 are able to pay the full cost of their care, and 19 are part pay. Thus 22% of the residents receive some charity. The amount of charity required by an individual will vary. The largest amount received by a resident each month is $165.00 of charity, but the average amount received by the 19 charity residents is $54.42 per month."

"\* \* \* \* \* \*

"With 86 residents, at present Hilltop Village is 65% occupied and the average age of said residents is approximately 80 years of age. The basic cost to a resident depends upon the type of room accommodation furnished and ranges from $150 per person per month to $215 per person per month. . . . The services provided by the corporation other than the rooming units and meals in the cafeteria generally are bed linen, towels, wash cloths and laundry of same, maid service for regular cleaning of rooms, constant nursing supervision and, the free use of the library, game, social and recreation area where various games are played, programs and meetings held and television is viewed, laundry room facilities where washers and dryers are located and chapel."

"\* \* \* \* \* \*

"The corporation has no source of income other than the rental from the housing units; nominal income from the services and vending machine agreement herein mentioned and possible contributions and donations. Since organization Hilltop Village has operated at a substantial loss."

It appears to me that Hilltop measures up commendably well when tested by the best gauge this court has yet provided. In Santa Rosa Infirmary v. City of San Antonio, 259 S.W. 926 (Tex.Com.App.1924, judg. adopted), it was held that a charity existed though 2,590 of 2,919 patients were full pay patients, 123 were part pay and 206 were full charity. In Santa Rosa about 14 per cent of the patients were charity patients; in Hilltop 22 per cent were charity residents. Santa Rosa made a profit, but used the profits for further services; Hilltop makes no profit but overcomes the deficit by outside gifts. Santa Rosa expresses the law of Texas and should here be followed. The Supreme Court of Kansas is one of a number of cases which approved Santa Rosa. It said in Nuns Third Order of St. Dominic v. Younkin, 118 Kan. 554, 235 P. 869 (1925):

" 'The fact that it charges and receives pay for patients able to pay, does not detract from the charitable nature of the service rendered. In [Lutheran] Hospital Association v. Baker, [40 S.D. 226, 167 N.W. 148] \* \* \* 95 per cent of the patients were pay patients. In City of San Antonio v. Santa Rosa Infirmary, [sic] [259 S.W. 926] \* \* \* 87½ per cent were pay patients. In St. Elizabeth Hospital v. Lancaster County, [109 Neb. 104, 189 N.W. 981] \* \* \* only a small per cent did not pay.

" * * * * * *

" 'If these incomes from pay patients and donations are used for the purpose of caring for or relieving the sick or disabled and increasing the facility of the institution for that purpose, and are not used for the purpose of declaring dividends or the financial profit (other than the paying of necessary operating expenses) of those connected with or having charge of the institution, such use is simply an extended use for charitable purposes.' " (pp. 559, 560, 235 P. 872).

The majority relies upon several cases in support of its denial of the exemption, but the controlling facts in each of them demonstrate the total absence of any charity at all. I rather suppose that the facts presented by those cases would defeat any charitable pretensions in any state. Nebraska denied an exemption in County of Douglas v. OEA Senior Citizens, Inc., 172 Neb. 696, 111 N. W.2d 719 (1961). All residents of the home which claimed tax exemption were required to pay the full charges. Only one class was permitted to remain in residence save at the will of the institution, and that class consisted of those who made a "donation" of $1,500. Those residents remained under a continuing obligation to pay their proportionate share of the expenses, maintenance, and even of the amortization of the loan on the institution.

Oregon denied an exemption in Oregon Methodist Home, Inc. v. Horn, 226 Or. 298, 360 P.2d 293 (1961). The home received no gifts or donations. Residents were admitted upon payment of a "founder's fee" which ranged from $7,000 to $20,000. In addition the residents were required to pay a monthly life care charge. Residents who could not pay were evicted or excluded. Everyone paid his full cost and upon subsequent failure to do so, he forfeited his founder's fee. Haines v. St. Petersburg Methodist Home, Inc., 173 So.2d 176 (Fla. App.1965) had an arrangement similar to that in the Oregon case. The founder's fee ranged from $5,000 to $7,000 plus a month-

ly charge. I respectfully suggest that these cases present arrangements by self-supporting elderly persons and of institutions designed to provide residences for pay and for persons who needed no charity. In them, the public was not served; the occupants were served. None of those cases relied upon by the majority present facts of charity as in Hilltop's case.

I would hold that Hilltop is entitled to the claimed exemption.

NORVELL, J., joins in this dissent.